John VARHOL, Plaintiff–Appellant,

v.

**NATIONAL RAILROAD PASSENGER CORPORATION, d/b/a AMTRAK,** Defendant–Appellee.

No. 88–2207.

United States Court of Appeals, Seventh Circuit.

Argued May 19, 1989.

Reargued En Banc May 30, 1990.

Decided Aug. 13, 1990.

---

Roy W. Strawn, East Alton, Ill., Howard E. Gilbert, Michael D. Richman, Gilbert & Associates, Skokie, Ill., for plaintiff-appellant.

Hugh C. Griffin, Richard F. Johnson, Paul J. Peralta, Lord, Bissell & Brook, Chicago, Ill., for defendant-appellee.

Howard A. Pollack, Mark M. Leitner, Charne, Clancy & Taitelman, Milwaukee, Wis., for Seventh Circuit Bar Ass'n amicus curiae.

Thomas R. Meites, Meites, Frackman & Mulder, Chicago, Ill., Stephen J. Spitz, Christopher J. Murdoch, Sperling, Slater & Spitz, Chicago, Ill., for Chicago Council of Lawyers amicus curiae.

J. Timothy Eaton, Coffield, Ungaretti, Harris & Slavin, Chicago, Ill., Dennis A. Rendleman, Leonard F. Amari, Illinois State Bar Ass'n, Staff Counsel, Springfield, Ill., for Illinois State Bar Ass'n amicus curiae.

Louis R. Hegeman, Kathryn S. Mueller, Gould & Ratner, Chicago, Ill., Michael S. Shaw, Highland Park, Ill., for Federal Bar Ass'n amicus curiae.

John D. Varda, Jon P. Axelrod, William D. Mollway, Dewitt, Porter, Huggett, Schumacher & Morgan, Madison, Wis., for Wisconsin Porcelain Co. Revised Retirement Plan, Wisconsin Porcelain Retirement Participants amicus curiae.

Before BAUER, Chief Judge,
CUMMINGS, WOOD, Jr., CUDAHY,
POSNER, COFFEY, FLAUM,
EASTERBROOK, RIPPLE, MANION,
KANNE, Circuit Judges, and
ESCHBACH, Senior Circuit Judge.

PER CURIAM.

John Varhol appeals from a jury verdict that awarded him what he considers to be grossly inadequate damages. Not surprisingly, Varhol's main contention on appeal is that the damage award was too low. Preserving that issue for appeal, however, required Varhol to file a timely new trial motion in the district court. *Hahn v. Becker*, 588 F.2d 768, 772 (7th Cir.1979). Unfortunately Varhol served his new trial motion well after the ten-day limit Fed.R.Civ.P. 59 allows. Whether Varhol's motion was timely, and thus whether Varhol has preserved his damages issue for appeal, depends on the status of *Eady v. Foerder*, 381 F.2d 980 (7th Cir.1967), which held that in certain "unique circumstances" a district court may dispose of an otherwise untimely new trial motion on the merits.

The case was originally argued before a three-judge panel. The full court plus Senior Judge Eschbach reheard the case en banc to consider whether to overrule *Eady*. The court as constituted is evenly divided. Six judges (Judges Cummings, Posner, Coffey, Easterbrook, Manion, and Eschbach) voted to overrule *Eady*. Six judges (Chief Judge Bauer and Judges Wood, Cudahy, Flaum, Ripple, and Kanne) voted not to overrule *Eady*. Since a majority of the court as constituted did not vote to overrule *Eady*, it remains as the law of this circuit.

Despite not overruling *Eady*, the court unanimously voted to affirm the district court on all issues, including damages. Those judges who voted to overrule *Eady* would affirm the amount of damages on procedural grounds, not reaching the issue on the merits because of Varhol's failure to file a timely new trial motion. Those judges who voted not to overrule *Eady* would hold on the merits that the district court did not abuse its discretion by not awarding Varhol a new trial on damages.

The court's opinion discusses those issues on which all judges have agreed. The question of whether to overrule *Eady* is discussed in separate concurring opinions.[*]

I.

John Varhol worked as a chief of on-board services for the National Railroad Passenger Corporation (more commonly known as Amtrak, the name by which we will refer to it). Varhol's job required him to ride on Amtrak's trains during their scheduled runs. On November 12, 1983, the train on which Varhol was working derailed near Jefferson, Texas. The car in which Varhol had been riding remained upright, but Varhol was thrown to his hands and knees. He picked himself up, checked various cars, and went outside to help remove passengers from the train. A short time after the accident, while still helping to remove passengers, Varhol slipped on some rocks near the track, again falling on his hands and knees. Varhol rode a train home to Chicago the next day, working along the way; he never worked again (for Amtrak and as far as we know for anyone else).

According to Varhol, the derailment caused him severe injuries that prevented him from returning to work, and caused him great pain and suffering. Varhol sued Amtrak under the Federal Employers Liability Act (FELA), 45 U.S.C. §§ 51–60. Amtrak admitted that its negligence caused the derailment, so the only issue at trial was damages. The problem for Varhol in proving damages was that he had had Multiple Sclerosis (MS) for ten to twenty years before the derailment. Varhol claimed that the derailment had made his MS worse; Amtrak contended that Varhol's condition after the derailment result-

---

[*] The Illinois State Bar Association and Appellate Lawyers Association, the Federal Bar Association, the Wisconsin Porcelain Retirement Participants, the Chicago Council of Lawyers, and the Seventh Circuit Bar Association filed briefs as amici curiae on the question of whether to overrule *Eady*. We thank these groups for their participation in this case.

ed from the natural progression of his MS, and that the derailment had nothing to do with exacerbating his MS. Varhol alleged that he suffered injuries apart from the exacerbation of his MS, but the evidence was such that a reasonable jury could have believed that other than a few scrapes and bruises he received in his falls, the bulk of Varhol's damages (for example, his physical ills and inability to return to work) were caused by his MS. Thus, the central issue at trial was whether, and to what extent, the derailment exacerbated Varhol's MS.

After both sides presented conflicting testimony on the medical issues, the trial judge submitted the case to the jury. Among the instructions the judge gave was a series of interrogatories concerning the extent to which the derailment aggravated Varhol's MS. Those interrogatories required the jury to determine, if it could, "what percentage of [Varhol's] present condition was caused by the injuries he suffered as a result of the train derailment ...," and then asked the jury if it took that "percentage into consideration in reducing the amount of damages that you have awarded" to Varhol. The jury found that the derailment caused one percent of Varhol's condition, and awarded him $237.00 in damages.

After the jury announced its verdict, the district judge told Varhol's lawyers that they could take twenty-one days to file any post-trial motions, including a motion for a new trial. Twenty-one days later, Varhol filed his motion for new trial. Not surprisingly, Varhol's motion contended that a new trial was necessary because the jury's verdict was grossly inadequate. Varhol also challenged the trial judge's decision to submit the special interrogatories on aggravation to the jury, and the judge's decision not to admit his medical bills into evidence. The trial judge denied Varhol's motion. Varhol appeals both the denial of his motion and the underlying judgment.

## II.

■ The sequence of events in the district court raises a question as to our appellate jurisdiction. Varhol did not file his notice of appeal until after the district court denied his new trial motion—fifty-nine days after the clerk entered judgment on the jury's verdict. See Fed.R.Civ.P. 58. Amtrak is not an agency of the United States, so Fed.R.App.P. 4(a) required Varhol to file his notice of appeal "within 30 days after the date of the entry of judgment." The Supreme Court and this court have repeatedly emphasized that a timely notice of appeal is "mandatory and jurisdictional." E.g., *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 61, 103 S.Ct. 400, 403, 74 L.Ed.2d 225 (1982) (per curiam); *Browder v. Director, Department of Corrections*, 434 U.S. 257, 264, 98 S.Ct. 556, 560–61, 54 L.Ed.2d 521 (1978); *Parke–Chapley Constr. Co. v. Cherrington*, 865 F.2d 907, 908–09 (7th Cir.1989); cf., *Sonicraft, Inc. v. NLRB*, 814 F.2d 385 (7th Cir.1987). This means what it says: if an appellant does not file his notice of appeal on time, we cannot hear his appeal.

■ If a party files a timely motion for a new trial under Fed.R.Civ.P. 59(a), the time for filing a notice of appeal from the underlying judgment does not begin to run until the district court enters judgment denying the motion. Fed.R.App.P. 4(a)(4). But Varhol's new trial motion was not timely, even though he filed his motion within the twenty-one days the district court gave him. Rule 59(b) provides that "[a] motion for a new trial shall be served not later than 10 days after the entry of the judgment." Rule 6(b) provides that a district court may not extend the time for filing any Rule 59 motion. Since the trial judge could not extend the time to file the new trial motion, Varhol's new trial motion was untimely and, according to Rule 4(a)(4), should not have tolled the time for filing his notice of appeal.

■ There is, however, a narrow exception to the general rule prohibiting an untimely appeal. This exception, known as the "unique circumstances" doctrine, originated in *Harris Truck Lines, Inc. v. Cherry Meat Packers, Inc.*, 371 U.S. 215, 83 S.Ct. 283, 9 L.Ed.2d 261 (1962) (per curiam). In *Harris*, the district court, acting before the 30–day appeal period had ended, grant-

ed the losing party's motion under then-Fed.R.Civ.P. 73(a) to extend the time to file its notice of appeal. (Fed.R.App.P. 4(a)(5) now provides for motions to extend the time to file a notice of appeal; we will discuss Rule 4(a)(5) in more detail below.) This court dismissed the appeal, finding that the circumstances the district court relied upon to grant the extension did not constitute "excusable neglect," as the rule required. The Supreme Court reversed, holding that if a party relies on a district court's extension of time to file a notice of appeal, and delays an appeal, the court of appeals should not dismiss the appeal because it disagrees with the district court's finding of excusable neglect. *Id.* at 217, 83 S.Ct. at 285. If the decision to grant an extension is open to second-guessing by the appellate court, the only way a party could protect itself would be to file an appeal within thirty days of the judgment; but the extension of time was supposed to allow the party to defer the decision to appeal. The Supreme Court reasoned that this obvious dilemma presented such "unique circumstances" that this court should not have disturbed the district court's decision to grant the extension. *Id.*

The Court extended the "unique circumstances" doctrine in *Thompson v. INS*, 375 U.S. 384, 84 S.Ct. 397, 11 L.Ed.2d 404 (1964). In *Thompson*, a party served a motion for a new trial twelve days after entry of judgment. The district court assured the party that his motion was timely, and went on to decide the motion on the merits. By the time the district court decided the motion, the time to appeal the underlying judgment had run. The party filed a late appeal, which this court dismissed. The Supreme Court relied on *Harris* to again reverse, holding that when a party performs "an act which, if properly done, postponed the deadline for filing an appeal," and the party relied on the district court's conclusion that the act had been properly done, the appeal is timely if filed within the mistaken new deadline. *Id.* at 387, 84 S.Ct. at 398–99. Later in the same term, the Court relied on *Thompson* to summarily reverse another court of appeals' dismissal of an untimely appeal.

*Wolfsohn v. Hankin*, 376 U.S. 203, 84 S.Ct. 699, 11 L.Ed.2d 636 (1964).

This court has applied the unique circumstances doctrine a number of times; indeed, we have remarked that the doctrine is "particularly well established" in this circuit. *Bernstein v. Lind–Waldock & Co.*, 738 F.2d 179, 182 (7th Cir.1984). For cases invoking the doctrine to save otherwise untimely appeals, see, e.g., *id.* at 182–83, *Textor v. Board of Regents*, 711 F.2d 1387, 1390–91 (7th Cir.1983), and the cases *Textor* cites. The unique circumstances doctrine as applied in *Thompson* has been criticized and its continuing vitality questioned. See *Parke–Chapley*, 865 F.2d at 913 n. 6; *Sonicraft v. NLRB*, 814 F.2d 385, 387 (7th Cir.1987); *Smith v. Evans*, 853 F.2d 155, 160–61 (3d Cir.1988); see also *Houston v. Lack*, 487 U.S. 266, 282, 108 S.Ct. 2379, 2388–89, 101 L.Ed.2d 245 (1988) (Justice Scalia, joined by Chief Justice Rehnquist, and Justices O'Connor and Kennedy, dissenting). But we are bound to follow *Thompson* unless we are "almost certain that the [Supreme Court] would repudiate" it if given the chance. See *Olson v. Paine, Weber, Jackson & Curtis, Inc.*, 806 F.2d 731, 734 (7th Cir.1986). Despite the questions as to *Thompson*'s continuing vitality, we will not speculate as to *Thompson*'s demise. Such speculation would be especially inappropriate given that the very term after *Lack*, a unanimous Court rejected a unique circumstances argument by distinguishing rather than overruling *Thompson*. See *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 109 S.Ct. 987, 992–93, 103 L.Ed.2d 146 (1989). While this is not conclusive proof that a Court majority would not overrule *Thompson* if necessary to decide a case, the fact that the Court in *Osterneck* chose not to overrule *Thompson* makes it overly bold for us to repudiate *Thompson*. Therefore, until the Supreme Court says otherwise, *Thompson* and the unique circumstances doctrine it pronounced remain good law, and we will continue to follow it, as we must. Cf. *Kraus v. Consolidated Rail Corp.*, 899 F.2d 1360, 1362–65 (3d Cir.1990).

That *Thompson* is still good law does not necessarily mean that it applies in this case. In *Osterneck*, the Supreme Court held that the unique circumstances doctrine will excuse an untimely notice of appeal when "a party has performed an act which, if properly done, would postpone the deadline for filing his appeal and has received specific assurance by a judicial officer that this act has been properly done." 109 S.Ct. at 993. In *Green v. Bisby*, 869 F.2d 1070 (7th Cir.1989), we held, based on *Osterneck*, that the unique circumstances doctrine did not save an untimely notice of appeal where the court entered a minute order extending the time to file a Rule 59 motion and the appellant, apparently relying on that order, filed an untimely Rule 59 motion. *Id.* at 1072. We reasoned in *Green* that the unique circumstances doctrine did not apply because the entry of the minute order was "not an act of affirmative representation by a judicial officer [that the act was properly done] as contemplated by *Osterneck*." *Id.*

It is difficult to distinguish this case from *Green*. It is true that in this case, the district court told Varhol in open court he could have 21 days to file any Rule 59 motions. But it hardly seems that reliance on a judge's spoken order in open court is any more reasonable than reliance on the court's written orders. It is also true that in *Green* a magistrate rather than the district court judge who ultimately decided the case entered the order extending the time to file the Rule 59 motion. See *id.* But a magistrate is a judicial officer, and there is nothing in *Green* to suggest that the magistrate was not properly empowered under 28 U.S.C. § 636(b) to consider matters relating to post-trial motions.

We do not have to decide whether *Green* controls this case, however, because there is an alternative basis for appellate jurisdiction. After the thirty days for appeal had run, Varhol recognized his jurisdictional problem and filed a timely motion under Fed.R.App.P. 4(a)(5) to extend the time to appeal. Rule 4(a)(5) allows such extensions after the original thirty-day period has ended if the court finds that the failure to file a timely notice of appeal resulted from

"excusable neglect." See *Lorenzen v. Employees Retirement Plan of Sperry & Hutchinson*, 896 F.2d 228, 231–32 (7th Cir. 1990); *Parke–Chapley*, 865 F.2d at 909–11; *Redfield v. Continental Cas. Co.*, 818 F.2d 596, 601 (7th Cir.1987). The trial judge found that Varhol's failure to file a timely notice of appeal resulted from his reliance on the extension of time to file the new trial motion and the consideration of that motion on the merits. The judge found this to be excusable neglect, and granted Varhol more time to file his notice of appeal.

■ One might reasonably wonder how Varhol's reliance could be "excusable." After all, Rules 59 and 6(b), and Fed.R. App.P. 4(a)(4) lead clearly to the conclusion that an untimely Rule 59 motion will not toll the time to appeal no matter what the district court may say or do. Surely a lawyer practicing in federal court ought to know the federal rules. Cf. *United States v. Beacon Bay Enterprises Inc.*, 840 F.2d 921 (Temp.Emer.Ct.App.1988). Attorney unfamiliarity with or misunderstanding of the federal rules, except in rare instances, is generally not excusable neglect under Rule 4(a)(5). See *Parke–Chapley*, 865 F.2d at 912–13.

Still, the trial judge did find excusable neglect in this case, and we generally give deference to that finding. See *Redfield*, 818 F.2d at 602; see also *Lorenzen*, 896 F.2d at 232–33. Amtrak has not challenged that finding. Moreover, this court relied on the fact that the district court had granted Varhol's Rule 4(a)(5) motion in denying Amtrak's motion to dismiss this appeal. *Varhol v. National Railroad Passenger Corp.*, No. 88–2207, (7th Cir. Aug. 8, 1988) (unpublished order). And despite the rules' clarity, it is at least arguable that reliance on a trial judge's extension of time to file a Rule 59 motion and subsequent consideration of that motion on the merits could constitute excusable neglect: it is understandable that litigants would put great stock in what federal judges say about procedural matters (even if what the federal judges say may turn out to be wrong). The circumstances in this case are

similar to those in *Feeder Line Towing Serv., Inc. v. Toledo, Peoria & Western RR Co.,* 539 F.2d 1107 (7th Cir.1976). In *Feeder Line,* an appellant in an admiralty case did not file its notice of appeal within Rule 4(a)'s thirty-day limit. The appellant's counsel thought that 28 U.S.C. § 2107, which provided a sixty-day appeal period in admiralty cases, controlled; counsel failed to recognize that under 28 U.S.C. § 2072, Rule 4(a)'s thirty-day limit, which was inconsistent with § 2107's sixty-day limit, controlled. *Id.* at 1108. The district court found that this was excusable neglect, and granted an extension of time to file a notice of appeal. We upheld this determination because counsel's error was not the result of irresponsibility but a good faith, though erroneous, interpretation of two provisions of law. *Id.* at 1109. This was so even though § 2072 states, on its face, that "[a]ll laws in conflict with [the federal] rules shall be of no further force or effect after such rules have taken effect."

The real question here is not whether we would have found Varhol's reliance to be excusable neglect but rather whether we should second-guess the trial judge's decision that it was. In this case, we think not. We are not saying that we will not overturn a district court's finding of excusable neglect where the party's excuse is so far afield (for example, counsel simply forgetting on day thirty to file the notice) that granting the extension would be a patent abuse of discretion. (Compare the discussion in *Lorenzen,* 896 F.2d at 232–33, concerning the types of mistakes that may warrant lenity under Rule 4(a)(5).) Allowing extension on frivolous grounds would turn Rule 4(a)(5) into a device to convert automatically the thirty-day appeal period into a sixty-day period, something the rule was not meant to be. See *In re O.P.M. Leasing Services,* 769 F.2d 911, 917 (2d Cir.1985) (Friendly, J.). Nor are we saying that the district court would have abused its discretion if it had found that Varhol's reliance was not excusable neglect. See *Lorenzen,* 896 F.2d at 233. But because it is at least arguable that Varhol's actions could constitute excusable neglect, Amtrak

has not challenged the district court's finding that it was, and an earlier ruling of this court has implicitly approved that finding, we will not second-guess the district court's finding of excusable neglect in this case. Since the district court did not abuse its discretion in granting Varhol an extension of time to file his appeal, and Varhol filed his appeal within the extended time granted, we have jurisdiction over this appeal even if Thompson's unique circumstances doctrine does not apply here.

### III.

■ On the merits, Varhol raises several issues besides the amount of damages. Varhol first complains that it was error for the district court to submit to the jury the special interrogatories concerning aggravation of his preexisting MS. As we have noted, those interrogatories essentially told the jury to determine what portion of Varhol's condition, as it existed at the time of trial, resulted from the derailment, and, if it could determine that portion, to take it into account in determining damages. Varhol complains that the interrogatory was inconsistent with the aggravation instruction the court gave the jury (which was, with slight modifications, a Fifth Circuit pattern instruction); according to Varhol, that instruction did not allow the jury to apportion damages for the aggravation of his MS between aggravation caused and not caused by the derailment. Varhol also complains that the interrogatory failed to instruct the jury that it could award damages resulting from the derailment (for example, pain and suffering from his injuries suffered in the derailment, emotional distress from the derailment, and the effects of a head injury he allegedly suffered in the derailment) separately from the aggravation of his MS. As a result of this omission, Varhol claims that the interrogatory unduly focused the jury's attention on aggravation, and confused the jury by essentially instructing the jurors that damages from aggravation of the MS were the only damages they could award.

District courts have broad discretion under Fed.R.Civ.P. 49(b) to submit special in-

terrogatories to juries. See *Elston v. Morgan*, 440 F.2d 47, 49 (7th Cir.1971). We find no abuse of discretion here. Varhol's contention that the aggravation instruction did not allow apportionment is hollow. That instruction read, in part: "If you find that there was such an aggravation, you should determine what portion of plaintiff's present condition resulted from the aggravation and make allowance in your verdict only for the aggravation." This clearly told the jury that it was to award damages to Varhol for his MS condition only to the extent his condition was aggravated by the derailment; in short, it told the jury to apportion. The special interrogatories led the jury, in an orderly way, through this apportionment process, and allowed the court and parties to decipher the jury's thinking on that issue. ·

■ Varhol's arguments about juror confusion and overemphasis on aggravation damages are equally unconvincing. Nothing in the special interrogatory told the jurors that aggravation was the only damage component they could award and the trial judge fully instructed the jury on every element of damages Varhol claimed. The district court also instructed the jury to follow all his instructions, and not to single any out as more important than the others. Moreover, at the instruction conference the judge directed *Varhol's* lawyers to draft the interrogatories. If his lawyers were concerned about the interrogatories possibly disregarding other damages, they should have drafted the interrogatories to get around that problem. But the interrogatories, as Varhol's counsel submitted them, did not include any warning to the jurors not to disregard other

damages, and Varhol's lawyers did not mention this possible problem to the judge. At all events, we think the instructions as a whole fully and fairly informed the jury about Varhol's damage theories. If any problem did exist with jury confusion or overemphasis on aggravation, however, Varhol's lawyers took no steps to avoid these problems at trial, so he cannot complain about them on appeal.

■ Varhol next raises a series of alleged errors by the trial judge in admitting and refusing to admit certain evidence. Varhol first contends that the judge erred by refusing to admit Varhol's bills for medical expenses incurred before trial. All these bills had been paid by Travelers Insurance Group Policy GA–23000, a policy for which Amtrak, not Varhol, paid the premiums. The trial judge found that because the bills had been paid by this policy, Varhol could not recover those expenses; therefore, the judge ruled that evidence of the amounts was inadmissible because the amounts were irrelevant and because of the possibility that the jury might misuse the amounts in calculating damages (for example, by deciding that trebling the bills would be a good way to fix damages).

Varhol does not contend that he was entitled to collect the medical expenses paid by the Travelers' policy, so we assume, without deciding, that he was not.[1] Varhol insists only that even if he could not recover the paid medical expenses, the district court should have admitted the bills, amounts and all, because they were necessary to assess the full extent of his injuries.

---

1. Section 5 of FELA, 45 U.S.C. § 55, provides that an employer "may set off ... any sum it has contributed or paid to any insurance, ... that may have been paid to the injured employee ... on account of the injury...." Despite the language "any sum it has *contributed or paid* to any insurance" (emphasis added), most courts have followed the lead of Judge Friendly's concurrence in *Blake v. Delaware & Hudson Ry. Co.*, 484 F.2d 204, 207 (2d Cir.1973) and have held that an employer is entitled to set off the entire amount of benefits paid by a policy it pays for if the collective bargaining agreement between the employer and the employee's union

expressly provides that the purpose of the policy is to indemnify the employer against FELA liability rather than serve as a wage equivalent for the employees. See, e.g., *Folkestad v. Burlington Northern, Inc.*, 813 F.2d 1377, 1382–83 (9th Cir. 1987); *Mead v. National R.R. Passenger Corp.*, 676 F.Supp. 92, 94–95 (D.Md.1987). The relevant collective bargaining agreement in this case provides that the policy is not a wage equivalent. Thus, under Judge Friendly's reasoning, setoff would have been proper. Compare *Mead, supra*, which found setoff proper for Amtrak under the same policy.   ˙

The district court did not abuse its discretion in refusing to admit the bills. We agree that since Varhol could not recover the expenses reflected in those bills, the amounts of those expenses bore little, if any, relevance to this case. See *Francis v. National R.R. Passenger Corp.*, 661 F.Supp. 244, 245 (D.Md.1987). Even if the amounts were somehow relevant, the district court did not abuse its discretion in finding the possibility of jury confusion, misuse, and double-recovery outweighed the bills' probative value. Fed.R.Evid. 403. This is especially so since several witnesses, lay and expert, testified concerning the extent of Varhol's injuries.

Varhol next contends that the district court erred by refusing to admit his tendered Exhibit 23. Exhibit 23 was a 1971 letter from a doctor at the Mayo Clinic to Varhol. During discovery, Varhol had given Amtrak a number of documents from the Mayo Clinic; by mistake, he did not include Exhibit 23 among them. When Varhol tried to introduce the letter, Amtrak objected, claiming surprise because it had never seen the letter. The district court excluded the letter for this reason. Varhol offers no authority for his argument that the court should have admitted the letter, so we could hold that he has waived this issue. See Fed.R.App.P. 28(a)(4); *Beard v. Whitley County REMC*, 840 F.2d 405, 408 (7th Cir.1988). But in any event, we see no abuse of discretion in refusing to admit a document that a party never submitted to his opponent before trial (even if by mistake), despite a discovery request by the opponent.

Varhol's third alleged evidentiary error was the district court's decision to allow Robert Fitzgerald, an Amtrak employee, to testify in Amtrak's case about matters beyond authenticating documents. Varhol claims he was surprised by Fitzgerald's testimony because Amtrak did not list Fitzgerald in the pretrial order; instead, Amtrak stated only that it would call a "Representative of National Railroad Passenger Corp." Again, Varhol has cited no authority to support his argument. But, in any event, Varhol's claim of surprise rings false. While Fitzgerald did not merely authenticate records, all his testimony concerned records that Amtrak had given Varhol in discovery. Moreover, Varhol himself had called Fitzgerald as a witness for the same reason Amtrak did—to authenticate and explain Varhol's employment records. We find no abuse of discretion in allowing Fitzgerald to do the same thing for Amtrak.

Varhol's final evidentiary challenge is his most substantial. Over Varhol's objection, the trial judge allowed Amtrak to cross-examine Varhol about a suspension from work he had received for purchasing stolen train tickets from his boss. The district court allowed the cross-examination under Fed.R.Evid. 608(b), which allows a questioner cross-examining a witness to attack the witness's credibility by inquiring into specific instances of misconduct by the witness that are "probative of truthfulness or untruthfulness."

Amtrak's counsel asked Varhol the following questions during cross-examination:

Q. Mr. Varhol, were you not suspended for 45 days on March 13, 1981?

A. Yes, I was.

Q. For the purchase and use of stolen Burlington Northern commuter tickets ...?

A. Yes.

Q. And did you not admit to your guilt, agree to the suspension, and make restitution for the stolen tickets you had purchased and used?

A. Yes.

Although Varhol testified on redirect that he did not know the tickets were stolen when he bought them, we think the questions and answers about the incident fairly raise the inference that Varhol knowingly bought and used stolen tickets. The fact that Varhol admitted "guilt" and paid restitution so indicates: why admit guilt or pay restitution if you are not guilty of anything? The jury did not have to draw this inference (and for all we know, it may not have), but it could have. The question, therefore, is whether Varhol's alleged conduct—buying and using stolen tickets—

was probative of Varhol's "character for truthfulness or untruthfulness."

Varhol insists that Rule 608(b) only allows questioning about acts that involve fraud or deceit—for example, perjury, subornation of perjury, false statement, embezzlement, and false pretenses. See *United States v. Amahia*, 825 F.2d 177, 181 (8th Cir.1987). Our own cases, however, do not use language that cabins cross-examination under Rule 608(b) in this way. See, e.g., *United States v. Holt*, 817 F.2d 1264, 1272–73 (7th Cir.1987); *Simmons, Inc. v. Pinkerton's, Inc.*, 762 F.2d 591, 605 (7th Cir. 1985); *United States v. Covelli*, 738 F.2d 847, 856 (7th Cir.1984). But the fact that none of these cases has specifically limited Rule 608(b) questioning to acts that involve fraud or deceit is not very helpful to us here because these cases all involved questioning about acts that involved some element of deceit or false statement.

The reason for allowing cross-examination under Rule 608(b) is to allow a party to attempt to cast doubt on a witness's reliability for telling the truth. Acts involving fraud or deceit clearly raise such doubt, while certain acts, such as murder, assault, or battery normally do not. But stealing and receiving stolen goods fall into a gray area. Stealing does not necessarily involve false statements or deceit, so it does not necessarily go *directly* to a witness's propensity to lie. But people generally regard acts such as stealing (and receiving and using stolen property) as acts that "reflect[ ] adversely on a man's honesty and integrity." *Gordon v. United States*, 383 F.2d 936, 940 (D.C.Cir.1967) (Burger, J.). In addition, such acts

"do disclose a disregard for the rights of others which might reasonably be expected to express itself in giving false testimony whenever it would be to the advantage of the witness. If the witness had no compunctions against stealing another's property ... it is hard to see why he would hesitate . to .obtain an advantage for himself or [a] friend in trial by giving false testimony."

David W. Louisell and Christopher B. Mueller, 3 Federal Evidence § 305, at 226 (1979)

(quoting Ladd, *Credibility Tests—Current Trends*, 89 U.Pa.L.Rev. 166, 180 (1940)). As a practical matter, it is difficult to distinguish between untruthfulness · and dishonesty. See *id.*

The question whether to allow questioning about acts such as receiving and using stolen property under Rule 608(b) is a close one. But we think that the connection between such acts and honesty and integrity, and between honesty and integrity and credibility, is sufficient to allow admission, subject to the district court judge's sound exercise of discretion. In this case, Varhol's credibility was a key issue. The stolen ticket evidence did arguably reflect upon his honesty, and Varhol's counsel had the opportunity to minimize any adverse inference on redirect examination. Therefore, we do not think it was an abuse of discretion to allow Amtrak to attack Varhol's credibility by cross-examining Varhol about the stolen tickets.

There is one further complication here, though: the trial judge never told the jury that it was to consider the evidence about the stolen tickets only in determining Varhol's credibility. Varhol insists that we must reverse because of the district court's failure to give a limiting instruction. Varhol, however, has not preserved this issue. At the time Amtrak asked the questions, Varhol's lawyers stood silent and mentioned nothing about a limiting instruction. In fact, at a sidebar immediately before Amtrak asked the questions (a particularly appropriate time to remind the judge about a limiting instruction), Varhol's counsel did not mention a limiting instruction.

It is true, as Varhol notes, that his counsel did ask the district judge several times during trial for a limiting instruction, and that the judge stated that he would give one. But all these requests came during arguments on Varhol's motion in limine, long before Amtrak actually asked the questions. We do not know the reason for Varhol's counsel's failure to speak up at the moment of truth: it could have been a tactical decision not to draw any more attention to the issue; it also could have been an oversight. Whatever the reason, coun-

sel's failure to speak up when the judge let the questioning in without giving a limiting instruction has waived the issue. If Varhol wanted a limiting instruction, he should have reminded the judge at the proper time to give one.

### IV.

For the reasons stated above, we affirm the district court's judgment.

AFFIRMED.

FLAUM, Circuit Judge, joined by BAUER, Chief Judge, WOOD, Jr., CUDAHY, RIPPLE and KANNE, Circuit Judges, concurring.

John Varhol won a jury verdict against Amtrak for $237. Immediately after the court discharged the jury, counsel for Varhol informed the district judge that he wished to file a post-trial motion for a new trial. With no objection from Amtrak, the court gave him 21 days. The next day, the court entered the jury verdict. On the twenty-first day, Varhol filed a motion for a new trial in accordance with the court's order.

In its reply, Amtrak responded with Rules 59(b) and 6(b). Rule 59(b) provides 10 days for motions for new trials and Rule 6(b) prohibits the district court from extending that time. Under these rules, the motion was not timely despite the court's purported extension of time. At the hearing on the motion, the court stated to Varhol's counsel that "to the extent you find yourself in a problem, it certainly is my fault, not yours.... I certainly did not intend to have you lose any appellate right by giving you twenty-one days within which to file post-trial motions."

Varhol's counsel was an experienced state trial lawyer. In Illinois state court, the trial judge can extend the time for a motion for a new trial. 110 Ill.Stat. ¶ 2–1202(b). Varhol's counsel should have refamiliarized himself with the Federal Rules before the trial, but when the court granted 21 days to file the motion without objection from opposing counsel, Varhol relied on the judge's knowledge of the Rules. Varhol's counsel made an error, but it was

a human error and not a procedurally fatal error. An experienced district court also made the error.

Our decision in *Eady v. Foerder*, 381 F.2d 980 (7th Cir.1967), was designed to deal with this precise situation. *"Eady* holds that when a judge extends the time within which to file an application for a new trial, and counsel relies to his detriment on that extension, the 'unique circumstances' of this reliance allow the court to dispose of the motion before it." *Bailey v. Sharp*, 782 F.2d 1366, 1368 (7th Cir.1986) (per curiam). If *Eady* is good law, then the trial court could hear the motion for a new trial and we can consider the merits of Varhol's damages arguments.

*Eady* has survived twenty-three years virtually without criticism except from those who would overrule it today. It has been favorably commented upon by scholars and was approved by this Court only four years ago. *Bailey*, 782 F.2d at 1368. It is consistent with the Federal Rules, Supreme Court precedent, and the principles of justice. Logic and the principles of *stare decisis* demand that we not overrule it and we do not. *Eady* remains the law of this Circuit and, therefore, we can reach the merits of Varhol's damages claim.

At first glance, *Eady* seems to conflict with the plain language of the Rules. Rule 6 flatly prohibits extensions of the 10–day time period to file a motion for a new trial. *Textile Banking Co. v. Rentschler*, 657 F.2d 844, 849 (7th Cir.1981). This rule is, in some sense, jurisdictional, in that it places a limit on the district court's power to entertain a motion for a new trial. *See, e.g., Branion v. Gramly*, 855 F.2d 1256, 1259 (7th Cir.1988). On this basis, Judge Manion and the judges who join him would overrule *Eady*. He reasons that the district court has no power to hear the motion; *Eady*, he concludes, impermissibly allows the court to do so.

But Judge Manion's syllogism does not lead to his conclusion. He claims that: (1) the district court was without power to extend the time; thus (2) the motion for the new trial was untimely and outside the

court's jurisdiction; and, therefore, (3) the court did not have the authority to consider the motion. Step (3), however, is not compelled by steps (1) and (2). Consider the same syllogism applied to personal jurisdiction: the court has no power under the Constitution over certain individuals; proceedings over those individuals are outside the court's jurisdiction; so the court can never hold proceedings where those individuals are subject to the power of the court. That conclusion is simply not correct: Under the Constitution, courts may lack jurisdiction over certain individuals, and they may lack the power to extend their jurisdiction affirmatively to those people, but, under certain circumstances, they are permitted to hear cases involving those individuals. *See* Fed.R.Civ.P. 12(h)(1). Judge Manion's logic leads to a similarly erroneous conclusion when applied to statutes of limitation. Like Rule 59(b), courts are not free to extend statutes of limitation, but, in certain circumstances, they can hear cases where the complaint was filed after the statutory deadline. *See* Fed.R.Civ.P. 8(c); *see also Roe v. Sears, Roebuck & Co.*, 132 F.2d 829, 832 (7th Cir.1943); *American Nat'l Bank v. FDIC*, 710 F.2d 1528, 1537 (11th Cir.1983).

With subject matter jurisdiction, of course, the limits on power are absolute. If there is no subject matter jurisdiction, nothing the parties do can give the court power to hear the case. Subject matter jurisdiction is not, however, necessarily the appropriate approach to the 10–day time deadline of Rule 59(b). Subject matter jurisdiction is controlled by a statute explicitly labeled as such. 28 U.S.C. § 1330 *et seq.* Neither Rule 59 nor Rule 6 are styled as jurisdictional. Moreover, subject matter jurisdiction is informed by concerns for federalism. No such concern is present here. And Judge Manion offers no good reason for treating the time limit of Rule 59(b) like

subject matter jurisdiction.[1] The Rules say nothing on their face about the nature of the jurisdictional restriction of the Rule 59(b) time limit other than that the district court may not extend it. Had Congress intended the 10–day time period to be interpreted like subject matter jurisdiction, it could have said so; yet it was silent. Rule 59(b) can be followed to its letter, read as jurisdictional, and yet be treated like personal jurisdiction.

Given that the nature of the jurisdictional deadline of Rule 59(b) can logically fall anywhere on this continuum, I believe there are good reasons for affirming *Eady*'s interpretation. Rule 1 requires that the Rules "be construed to secure the just, speedy, and inexpensive determination of every action." Fed.R.Civ.P. 1. As Professors Wright and Miller have noted, *Eady* is consistent with this mandate because it serves these interests. *See* 4A Wright & Miller, *Federal Practice and Procedure* § 1168, at 504–05 (2d ed. 1987).

Justice is served by applying *Eady* to the present case. Varhol was informed by the judge that the time deadline could be extended and he relied on the deadline in good faith. Amtrak did not raise any objection at the time. If Amtrak was as uninformed as Varhol, then the incentive for knowing the Rules to which Judge Manion alludes is not created by giving Amtrak the benefit of both parties' mistake. Alternatively, Amtrak knew the rules all along, and attempted to gain an advantage by keeping silent while Varhol erroneously relied on the judge and then springing the deadline on him once it was past. "The Federal Rules [however,] reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits."

---

1. Judge Manion urges that his reading of Rules 6 and 59 does not depend on treating them as subject matter jurisdiction. Judge Manion *infra* at p. 1573. He advances the notion that his suggested result "flow[s] naturally" from a reading of the Rules. I must take exception with this conclusion. As a logical matter, there is no reason that the time deadlines of Rule 6 and 59 should not be read like statutes of limitations, personal jurisdiction, subject matter jurisdiction, or anywhere in between. None of these approaches and their resultant consequences "flow naturally" from a reading of the Rules; they are all policy choices that must be informed by the structure, purposes, and history of the Rules.

*Conley v. Gibson,* 355 U.S. 41, 48, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957). Justice is served by allowing Varhol to proceed with his motion; he relied in good faith on a statement of the district judge.

Moreover, *Eady* is consistent with the history of the Federal Rules. As one noted scholar and jurist has noted, "[t]he advent of the Federal Rules swung the courthouse door open. They permitted the full development of public law cases and the prompt consideration of the merits. Parties could no longer rely on clever maneuvers, but were required to make their best cases on the merits and face a dispositive ruling or a trial." Weinstein, *After Fifty Years of the Federal Rules of Civil Procedure: Are the Barriers to Justice Being Raised?,* 137 U.Pa.L.Rev. 1901, 1920 (1989); *see also Conley,* 355 U.S. at 48, 78 S.Ct. at 103. When enacting the Rules, "the rulemakers wanted to escape the rigidities and technicalities that had attended the development of procedural codes...." Shapiro, *Federal Rule 16: A Look at the Theory and Practice of Rulemaking,* 137 U.Pa.L.Rev., 1969, 1975 (1989); *see also* Burbank, *The Rules Enabling Act of 1934,* 130 U.Pa.L.Rev. 1015 (1982); Subrin, *How Equity Conquered Common Law: The Federal Rules of Civil Procedure in Historical Perspective,* 135 U.Pa.L.Rev. 909 (1987). *Eady* fulfills this promise: it avoids an overly rigid interpretation of the Rules and encourages courts to reach the merits of the dispute.

*Eady* takes a middle course between treating the time deadlines like personal jurisdictional limits and subject matter jurisdictional limits on power.[2] Unlike person-al jurisdiction or statutes of limitation, *Eady* does not allow parties or the district judge to waive the time deadlines voluntarily. This middle course provides an appropriate balance between the institutional concerns of finality and uniformity and the concern for individual justice in a given case. The courts as a whole have an interest in finality of judgments beyond that of the individual parties and the parties should not be able to subvert this. Moreover, justice is achieved through the even-handed application of the Rules. *See Pavelic & LeFlore v. Marvel Entertainment Corp.,* —— U.S. ——, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989); *Hallstrom v. Tillabrook County,* —— U.S. ——, 110 S.Ct. 304, 311, 107 L.Ed.2d 237 (1989); *Browder v. Director, Dept. of Corrections,* 434 U.S. 257, 98 S.Ct. 556, 54 L.Ed.2d 521 (1978). By refusing to permit parties to waive the 10–day time limit voluntarily, *Eady* comports with these principles. Yet, neither uniformity nor the institutional interest in finality *compel* a subject matter jurisdiction-like approach to the Rules. *Cf. Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982). By not treating the time deadline like subject matter jurisdiction, *Eady* is able to provide justice in a limited set of cases to individuals whose potentially valid substantive claims would be barred by an unyielding interpretation of the procedural rules. *Eady,* therefore, provides an equitable balance between possible applications of Rule 6.

Moreover, *Eady* is consistent with the manner in which the Supreme Court has interpreted time deadlines under the Rules.

---

**2.** It is argued that the approach of this concurrence might require the overruling of *Bailey* because *Bailey* takes a subject matter jurisdictional approach. Judge Manion *infra* at p. 1573, n. 1. (Needless to say, with an evenly divided Court, *Bailey,* like *Eady,* cannot be overruled.) This suggestion is hard to fathom as what is advocated herein is the reaffirmance of *Bailey.* Moreover, while advancing new and hopefully compelling reasons for upholding both *Bailey* and *Eady,* nothing in the proffered logic contradicts those cases. *Bailey* contains dicta to the effect that once the 10–day time period of Rule 59(b) expires, recourse lies in appeal, but it then goes on to reaffirm the *Eady* exception to this broad statement. By taking this middle ground, *Bailey* does not approach the Rules as if they stated limits on subject matter jurisdiction. Even if it were the case that the quoted sentences are inconsistent with the approach of this concurrence (which they are not), the sections of *Bailey* quoted by Judge Manion are dicta and are not contained in the section of *Bailey* discussing *Eady.* It appears a stretch, at the least, to suggest that a decision is overruled because the underlying logic of a subsequent case conflicts (which it does not) with a possible interpretation of two sentences of dicta in the prior decision.

Primarily, *Eady* is in accord with the mandate that we read the rules for their plain meaning. *Pavelic*, 110 S.Ct. at 460. Rule 59(b) on its face is nothing more than a limitation period. It "set[s] a definite point in time when litigation shall be at an end." *Browder*, 434 U.S. at 264, 98 S.Ct. at 561. Neither Rule 59(b) nor Rule 6(b) say anything about waiver on their face. *Eady*, therefore, does not conflict with the plain meaning of the Rules.

*Eady* is also consistent with *Thompson v. INS*, 375 U.S. 384, 84 S.Ct. 397, 11 L.Ed.2d 404 (1964) and *Harris Lines v. Cherry Meat Packers, Inc.*, 371 U.S. 215, 83 S.Ct. 283, 9 L.Ed.2d 261 (1962). We recognized in *Amax Coal v. Director, OWCP, U.S. Dept. of Labor*, 892 F.2d 578 (7th Cir.1989), that *Eady* "derive[d] from the analogous decisions in *Harris Lines* and *Thompson* where the Supreme Court recognized an equitable exception to the requirement that notices of appeal be filed on time—when counsel relies on the trial court's assurance that the time to file the notice of appeal has been extended, either by its discretionary power to do so under FRCP 59(a) or by erroneously attempting to extend the time for filing post-trial motions which toll the time for filing notice of appeal." *Id.* at 581 n. 5 (citations omitted). I agree with Judge Manion that *Eady* is not compelled by *Thompson*, but I believe that it is consistent with it. Both cases recognize room for equity in the Rules where a party relies on a representation by the district judge. *Thompson* excuses precisely the same mistake as *Eady:* a mutual mistake by the district court and the parties about the power of the court to extend the time for a Rule 59 motion. Moreover, *Thompson* confirms that the time periods in the Rules should not be interpreted like the rules governing subject matter jurisdiction.

Judge Manion attempts to distinguish *Thompson* by noting that in *Thompson* a mechanism exists for achieving the outcome that the district court was trying to reach, so where the district judge could have reached the same end by a proper procedure, we should not penalize the parties where it did so through an improper procedure. This argument proves too much, however, as Judge Manion himself points out that the trial judge could have created a *de facto* 21–day filing deadline in our case by simply withholding the formal entry of judgement for 11 days. There is, therefore, a mechanism for achieving the same end. Judge Manion also attempts to distinguish *Thompson* by stating that *Thompson* merely covers cases of mutual mistake by the district court and the parties, but that in our situation, there should be no mutual mistakes because the district court has no power to hear an untimely motion. Yet *Thompson* involves the same mistake as *Eady*. The mistake in *Thompson* cannot be excusable and the mistake in *Eady* inexcusable. The only difference between the cases is that they deal with the effects of the same mistake on different courts. Yet I discern no principled reason for guarding the jurisdiction of trial courts more jealously than that of appellate courts.

*Eady* has also stood the test of time. It has survived over twenty years of trouble-free life. Judge Manion's rationales for rejecting *Eady* existed in 1967 when the case was decided and no new or compelling reasons have been advanced for discarding it at this date.[3] Judicial restraint counsels

---

**3.** Judge Manion is correct that I am offering new reasons for upholding *Eady*. Judge Manion *infra* at p. 1576. The fact that a decision has become stronger over time once we have had an opportunity to evaluate it is, however, an argument for upholding the decision, not reversing it. My point about *stare decisis* is that Judge Manion offers no new reasons for overruling *Eady* and, as the judge wishing to change the law, he should shoulder that burden. Respectfully, I can find nothing in his concurring opinion advancing a reason that was not present when *Eady* was decided (such as an amendment

to the Rules or the Supreme Court overruling *Thompson* ) and, therefore, I believe that the burden is not carried.

Moreover, *Eady* is not inconsistent with *Hulson v. Atchison, Topeka & Santa Fe Ry. Co.*, 289 F.2d 726 (1961) and *Nugent v. Yellow Cab Co.*, 295 F.2d 794 (1961). Both those cases hold that district courts cannot extend time under Rule 59(b). *Eady* holds that when the district court inadvertently does so and counsel relies on the court to its detriment, equity demands that we allow the court to hear the Rule 59 motion. I

that absent new reasons, we not reach out to overrule old precedent.

In sum, *Eady* is consistent with a plain reading of the Rules, including Rule 1, which, like Rule 6(b), is an act of Congress which we cannot ignore. It is supported by Supreme Court precedent, the history of the Rules, and the principles of *stare decisis*. *Eady*, therefore, remains the law of this Circuit.

Under *Eady*, we can reach the merits of Varhol's appeal on the denial of the motion for a new trial. An order denying a motion for a new trial is committed to the sound discretion of the district court and, on review, the district court will not be overturned "except where exceptional circumstances show a clear abuse of discretion." *Forrester v. White*, 846 F.2d 29 (7th Cir. 1988). In determining whether to grant a new trial, the district court must decide if the verdict is against the manifest weight of the evidence. *Id.*

The district court denied the motion because it found that the evidence established that Varhol's injuries were due to the normal symptoms and progression of multiple sclerosis. The same injuries Varhol claims were the result of the accident—leg problems, dizziness, and headaches—could have been symptoms of multiple sclerosis which Varhol contracted in 1960. The jury was entitled to consider the probability that Varhol's injuries resulted from a pre-existing disease. *See Abernathy v. Superior Hardwoods, Inc.*, 704 F.2d 963, 973 (7th Cir.1983). Given the mitigating evidence, I cannot say that the jury's verdict was against the manifest weight of the evidence. I conclude, therefore, that the district court's decision not to grant a new trial should be affirmed.

MANION, Circuit Judge, joined by CUMMINGS, POSNER, COFFEY, and EASTERBROOK, Circuit Judges, and ESCHBACH, Senior Circuit Judge, concurring.

The main question we face in this case is whether the district court properly considered the merits of Varhol's new trial motion. The answer, based strictly on the Federal Rules, would appear to be a simple, and resounding, "No!". Rule 59 allows only ten days to serve a new trial motion. Rule 6(b) forbids district courts from extending that time, so any extension does not make an otherwise untimely motion timely. *Textile Banking Co. v. Rentschler*, 657 F.2d 844, 849 (7th Cir.1981). We have repeatedly held that district courts have no power to grant untimely Rule 59 motions. *E.g., Branion v. Gramly*, 855 F.2d 1256, 1259 (7th Cir.1988); *Bailey v. Sharp*, 782 F.2d 1366, 1369 (7th Cir.1986); *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1112 (7th Cir.1984); *Hulson v. Atchison, Topeka & Santa Fe Ry. Co.*, 289 F.2d 726, 729 (7th Cir.1961). Accord *Beliz v. W.H. McLeod & Sons Packing Co.*, 765 F.2d 1317, 1325 (5th Cir.1985). Since Varhol's new trial motion was untimely (despite the trial judge's purported extension of time to file it), it would appear the district court had no power to, and should not have, considered the motion on its merits. If the trial judge did not have the

---

believe that these decisions are consistent in the same way that *Eady* is consistent with a strict reading of Rules 6 and 59, as outlined in my opinion. At most, *Eady* creates an exception to the rule in those cases, not a wholesale overruling, which is the course Judge Manion would take today. Moreover, even if *Eady* overruled those cases, the fact that this Court once overruled a decision is not grounds for displacing the principle of *stare decisis*, the mandate that we leave decisions in place absent new and compelling reasons for overruling them.

Finally, *Eady* does not stand alone. *See Bailey*, 782 F.2d at 1368, *Amax Coal*, 892 F.2d at 581 n. 5, *Mayer v. Angelica*, 790 F.2d 1315, 1338 (7th Cir.1986), *cert. denied*, 479 U.S. 1037, 107 S.Ct. 891, 93 L.Ed.2d 843 (1987), and *Parisie v. Greer*, 705 F.2d 882, 898 (7th Cir.1983) (en banc) (Swygert, J., concurring), for cases citing *Eady* with approval. The Third Circuit has adopted a similar rule in the context of motions for a reduction of sentence. *See Government of the Virgin Islands v. Gereau*, 603 F.2d 438, 442 (3d Cir. 1979) (per curiam) (motion for reduction of sentence filed beyond the 120–day deadline can be considered if the parties relied on the district court). Noted scholars have commented favorably on *Eady. See, e.g.,* 4A Wright & Miller, *Federal Practice and Procedure* § 1168, at 504–05 (2d ed. 1987). That we have not had to invoke *Eady* between 1967 and today stands testament only to the apparent competence of the district courts in complying with Rule 6, and is not an implied criticism of *Eady*.

power to consider the merits of Varhol's new trial motion, we must affirm that decision without reaching the merits; if the district court could not properly grant the motion, it could not have been error to deny it. As a practical consequence, this means Varhol will have forfeited his opportunity for review of the amount of damages because a timely motion for new trial is necessary to preserve that issue for appeal. *Hahn v. Becker,* 588 F.2d 768, 772 (7th Cir.1979).

This reasoning, however, runs head-on into this court's decision in *Eady v. Foerder,* 381 F.2d 980 (7th Cir.1967). In *Eady,* the district court told counsel for the losing party that he could have thirty days to file any post-trial motions. Counsel, relying on this statement, filed a Rule 59 motion 28 days after entry of judgment. The district court granted the motion. On appeal, the appellant argued that the district court had no power to grant the motion because it was untimely. *Id.* at 980–81. We rejected this argument, relying on *Harris* and *Wolfsohn* (and thus, impliedly, on *Thompson,* the case on which *Wolfsohn* relied) to hold that where a district court extends the ten-day period to file a new trial motion, and a party relies on that extension in filing an untimely motion, the unique circumstances of that reliance allow the district court to consider the motion's merits. *Id.* at 981. We have since interpreted *Eady* to apply only where a party actually relies on the extension; that is, where the party is not aware that the court cannot extend the time to file the motion. See *Bailey,* 782 F.2d at 1368–69. Amtrak does not contend that Varhol's attorneys were aware that the trial judge could not extend the time for filing his new trial motion, and thus we assume that they did actually rely on the district court's extension. Therefore, the circumstances in this case fall squarely into

*Eady*'s judge-made exception to Rule 59's time limit.

Whether or not we consider Varhol's damages argument on the merits depends on whether *Eady* should remain the law in this circuit. It should not. There are powerful reasons to overrule *Eady,* the most important being that *Eady* is inconsistent with the federal rules. In *Pavelic & Le-Flore v. Marvel Entertainment Corp.,* —— U.S. ——, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989), the Supreme Court recently reiterated that courts are to give the federal rules their "plain meaning." *Id.* 110 S.Ct. at 458. As we have seen, Rules 59 and 6 are as plain as can be: Rule 59 gives a litigant ten days to serve post-trial motions, and Rule 6 denies the district court the authority to extend that time limit.

It follows from this that the district court may not rule on an untimely Rule 59 motion. The assertion that Rules 59 and 6 do not explicitly spell out the consequences of a late motion, and that we should thus treat Rule 59's deadline not as a requirement for subject matter jurisdiction but rather as akin to a requirement of personal jurisdiction or a statute of limitations (both of which can be waived) does not change this result. The problem is that *Eady* allows—in fact, depends on—the district court extending the time to file a Rule 59 motion, which is exactly what Rule 6 expressly prohibits. The rules' drafters did not have to spell out the consequences of a late-filed Rule 59 motion; those consequences flow naturally from Rule 6's prohibition of extension of time to file Rule 59 motions. Even Professors Wright and Miller admit that "an intelligent reading of the rules [makes] it quite clear that the district court has no authority ... to entertain a new trial motion [served] more than ten days following entry of judgment...." 4A Charles Alan Wright & Arthur Miller, *Federal Practice and Procedure* § 1168, at 506 (2d ed. 1987).[1]

---

1. My position that we should overrule *Eady* does not depend on calling Rules 6 and 59 rules of subject matter jurisdiction (in the strict sense). In any event, it is too late in the day to question the "jurisdictional" nature of the time limits in Rules 6 and 59. In *Bailey,* this court issued a writ of mandamus ordering a district

court to vacate an order granting a new trial because the movant in district court had served his new trial motion after the ten-day limit set by Rules 59 and 6 had expired. See 782 F.2d at 1369. The premise on which we granted the writ was that the district court lacked jurisdiction to grant a new trial because the new trial

Whether Rules 59 and 6 limit a court's subject matter jurisdiction, strictly speaking, is not important. What is important is that the rules set limits, and that those limits lead to the conclusion that district courts may not decide untimely Rule 59 motions. The real issue here is whether the federal rules, as written, bind the federal courts. On this issue, the Supreme Court has recently and emphatically spoken: in applying the federal rules, our task is to apply the rules' text as we find it, not to change it or attempt to improve it. See *Pavelic & LeFlore*, 110 S.Ct. at 460. Appeals to Rule 1 and "the interest of justice" do not excuse us from heeding this command. The problem with relying on Rule 1 is that Rule 1 is a rule of construction. *Eady,* however, did not construe the rules; it ignored them. The panel in *Eady* did not mention Rule 1, or even attempt to relate its holding to the text of any federal rules. Rules of construction such as Rule 1 are necessary to interpret unclear statutes. Rules 59 and 6, however, do not require a rule of construction to aid in their interpretation. Rule 1 just does not apply to this case, and we ought not use that rule as a warrant to bend the other rules any time an arguably harsh result may offend our sense of "justice." Cf. *Schiavone v. Fortune,* 477 U.S. 21, 27–32, 106 S.Ct. 2379, 2383–86, 91 L.Ed.2d 18 (1986) (rejecting arguments based on Rule 1 and the truisms that pleading is not a "game of skill" and that courts are not to avoid decisions on the merits because of "mere technicalities," because in interpreting a clear rule "the choice ... is between recognizing or ignoring what the Rule provides in plain language.").

If district courts really need a mechanism to extend the time for filing post-trial motions after entering a judgment, it is up to the Supreme Court and Congress, through the procedure established by the Rules Enabling Act, 28 U.S.C. § 2072, to provide that mechanism.[2] The judiciary and Congress "have established a long tradition of shared responsibility" in regulating practice and procedure in the federal courts, a tradition "embodied principally ... in the Rules Enabling Act." The Act "was designed to foster a uniform system of procedure throughout the federal system...." See *G. Heileman Brewing Co. v. Joseph Oat Corp.,* 871 F.2d 648, 665 (7th Cir.1989) (Ripple, J., dissenting). Though local courts may supplement the federal rules, that supplementation may not conflict with the rules. See *id.;* Fed.R.Civ.P. 83. Courts of appeals and district courts have no power to change the federal rules on their own and upset the uniform procedural system Congress and the Supreme Court have established. By ignoring the clear text of Rules 59 and 6—in effect, amending those rules—*Eady* subverts the relationship between the judiciary and Congress in regulating practice and procedure in the federal courts embodied in the Rules Enabling Act.

*Eady*'s inconsistency with the federal rules, and the damage *Eady* does to the rulemaking process established by Congress and the judiciary are themselves compelling reasons to overrule *Eady.* But there are other reasons as well. *Eady,* as we interpreted it in *Bailey v. Sharp,* 782 F.2d 1366 (7th Cir.1986), applies only to lawyers who have never heard of the case and are ignorant of the rules prohibiting extensions of time to file post-trial motions.

motion was untimely. See *id.* at 1367, 1369. *Bailey* made the jurisdictional nature of Rules 6 and 59, and the nature of the "jurisdiction" of which it spoke, abundantly clear:

> Rules 6 and 59 allocate decision-making authority between the district court and the court of appeals. Once the time prescribed for a motion lapses, the parties' recourse lies in appeal rather than continued importuning of the district judge.

*Id.* at 1368. Language speaking about the allocation of decision-making authority between trial and appellate courts is the language of subject matter jurisdiction. The approach Judge Flaum's concurrence takes would at least require us to question if not overrule *Bailey,* a decision on which his concurrence relies.

**2.** In any event, such a change is probably not necessary. A judge who wants to give the parties more than ten days to file post-trial motions can easily do that by postponing the formal entry of judgment by any amount of time necessary. See Fed.R.Civ.P. 58. So, *Eady* not only created an unauthorized exception to the rules' time limits; it also created an unnecessary one.

See *id.* at 1368–69. *Eady* requires actual reliance on the district judge's misstatement; a lawyer who discovers *Eady* or reads the federal rules cannot actually rely on the misstatement because he knows (or should know) the judge is wrong. *Eady* thus rewards the uninformed (or those who pretend to be). Not knowing the rules, however, is something to be deterred, not promoted. Certainly, uninformed attorneys do not benefit litigants or the court system.[3]

Moreover, since application of *Eady* turns on a lawyer's knowledge of the law, the district court's jurisdiction over a post-trial motion could turn on a detailed factual inquiry into counsel's knowledge, thought processes, and even honesty (is the lawyer really unaware, or is he just pretending?). Rules 59 and 6 are clear and simple, as they should be. Courts and litigants can know what is properly before a court without bogging down in procedural minutiae. Detailed factual inquiries into an attorney's state of mind such as *Eady* may require, besides being unseemly, disrupt that clarity and simplicity. See *Bailey*, 782 F.2d at 1373 (concurring opinion).

If the Supreme Court's unique circumstances cases compelled the result in *Eady*, we would be bound to uphold *Eady* despite the reasons for overruling it. But *Harris* and *Thompson* do not compel *Eady*, and probably do not even support it. *Harris* and *Thompson* both depended on the fact that certain things that occur in the district court may extend the time for filing a notice of appeal. The question in those cases was how a mutual mistake between the judge and the parties about the existence of that time extending act—in *Harris*, a possibly erroneous finding of excusable neglect and extension of time to appeal before the original appeal period had run, and in *Thompson* an erroneous extension of time to file a Rule 59 motion—would affect the appeal. See *Bailey*, 782 F.2d at 1369–70 (concurring opinion). The Court in *Harris* and *Thompson* merely held, in effect, that courts of appeals should not penalize litigants when such mutual mistakes occur.

There is no rule allowing district court judges to extend the time to file post-trial motions, and Rule 6 flatly prohibits extensions. There can be no mutual mistake about how an erroneous extension would affect the court's ability to hear a post-trial motion: the district court has no power to hear an untimely motion. *Thompson* stands for the proposition that a district court's mistake, where a mechanism exists for extending the time to appeal, should not deprive the court of appeals of jurisdiction. *Eady*, however, allows the district court to expand its *own* power to hear a post-trial motion beyond the limits the federal rules set and in the face of a rule that expressly disallows such extensions. Nothing in *Thompson* or *Harris* (or any other Supreme Court case we know of) suggests that courts should be able to expand their own power simply by asserting that power. Indeed, far from being compelled by any Supreme Court precedent, *Eady* is contrary to a number of recent Court cases holding that courts are to apply the federal rules as

---

**3.** While *Eady* supposedly states an "equitable" exception to the rules, it is puzzling why this equitable exception should apply here but not in *Bailey*. *Bailey* was a much more compelling case. In *Bailey*, the lawyer relying on *Eady* did what a good lawyer should do: he researched the law regarding time limits on post-trial motions and found *Eady*. Unfortunately, he misread *Eady* as saying that a district court can generally hear untimely motions, rather than as stating an equitable exception to the rules. (This is the inevitable result of *Eady*'s muddying the waters; the rules themselves are clear, and had the lawyer in *Bailey* had only the rules before him he could only have concluded the district court's extension of time was improper.) See *Bailey*, 782 F.2d at 1368. In this case, Va-

rhol's lawyer took the judge's word without doing his homework. It seems odd (and far from "equitable") to penalize the litigant whose lawyer actually did his homework (but made an honest mistake in misreading what he found) while not penalizing the litigant whose lawyer failed to do what he should have done—research the problem. For an "equitable" exception, *Eady* hardly seems to apply equitably.

Moreover, the fact that Amtrak's counsel may have been uninformed, or may even have kept silent to spring a procedural trap does not, as Judge Flaum's concurrence implies, excuse Varhol's lawyer's failure to know the rules. Even in procedural matters, two wrongs do not make a right.

written, and emphasizing the importance of strictly enforcing Congressionally-mandated procedural requirements, even if the result seems somewhat arbitrary or even unfair. See, e.g., *Pavelic*, 110 S.Ct. 456; *Hallstrom v. Tillamook County*, — U.S. ——, 110 S.Ct. 304, 311, 107 L.Ed.2d 237 (1989) ("In the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of even-handed administration of the law."); *Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988) (Fed.R.App.P. 3(c) requires each party appealing a judgment be named in notice of appeal; appellate court has no jurisdiction over appeal against parties not named); *Schiavone*, 477 U.S. at 27–32, 106 S.Ct. at 2383–86; *Baldwin County Welcome Center v. Brown*, 466 U.S. 147, 152, 104 S.Ct. 1723, 1726, 80 L.Ed.2d 196 (1984) (judges may not disregard procedural requirements "out of a vague sympathy for particular litigants").

The Second Circuit has recognized that *Thompson* does not support *Eady*'s holding. In *Long Island Radio Co. v. NLRB*, 841 F.2d 474, 478–79 (2d Cir.1988), the court rejected an argument, based on *Thompson*'s unique circumstances doctrine, that the National Labor Relations Board had jurisdiction to consider an untimely attorney's fee application because the Board had mistakenly granted an extension of time to file the application. The Second Circuit declined to extend *Thompson*, reasoning that "there was no suggestion in *Thompson* that the district court, in misstating the timeliness of the new-trial motion, had succeeded in enlarging its own jurisdiction to entertain that motion." *Id.* at 478–79. The Second Circuit cited not *Eady*, but the concurrence in *Bailey* (which criticized and urged overruling *Eady*), and the Second Circuit analysis effectively repudiated *Eady*. Thus, *Eady* puts us in conflict with another circuit.

Since *Eady* is inconsistent with the federal rules and not compelled by any Supreme Court precedent, the only reason left for not overruling it is *stare decisis*, or as our colleagues put it, "the test of time." But *stare decisis* does not compel us to uphold *Eady* merely because it has been around a long time. Judge Flaum's concurrence in this case is the first attempt by any judge in this (or any other) circuit to attempt to supply a principled basis for *Eady*'s holding. *Eady* itself offered no rationale for its holding other than citations to *Harris* and *Wolfsohn*. The panel in *Eady* completely ignored the federal rules (around which any discussion of the problem faced in *Eady* and here must turn), and failed to present or analyze any arguments for or against its holding. *Eady* also ignored two earlier decisions from this court, *Hulson v. Atchison, Topeka & Santa Fe Ry. Co.*, 289 F.2d 726 (1961), and *Nugent v. Yellow Cab Co.*, 295 F.2d 794 (1961), both of which held that district courts had no power to rule on untimely Rule 59 motions despite the fact that the district courts in those cases had expressly extended the time for filing those motions. Given that no basis for *Eady*'s holding has ever been advanced in this circuit until today, it is at best creative to suggest that *stare decisis* compels us to uphold *Eady* because "the rationales for rejecting *Eady* existed in 1967 when the case was decided." It is also ironic to rely on *stare decisis*, given *Eady*'s treatment (or, more accurately, nontreatment) of *Hulson* and *Nugent*, which only six years earlier had rejected the very approach *Eady* took. What happened to *stare decisis* then?

As for the "test of time": Despite having more than twenty years to pick up support, no other case, in this circuit or other circuits, has followed *Eady*. (There is a passing reference to *Eady* in *Mayer v. Angelica*, 790 F.2d 1315, 1338 (7th Cir.1988), that could be read as approving *Eady*, but *Mayer* specifically bypassed the procedural problem so its reference to *Eady* is dictum.) See *Bailey*, 782 F.2d at 1370 (concurring opinion); 4A Wright & Miller, *supra*, § 1168, at 505 (stating that "[n]o other circuit has followed the result in *Eady*," a statement that the 1990 pocket part does not retract, and that our colleagues' con-

currence does not challenge).[4] In fact, as we have seen, the Second Circuit has (at least implicitly) rejected *Eady* and adopted the approach of the *Bailey* concurrence (which was also the approach of *Hulson* and *Nugent,* the two cases from this circuit *Eady* ignored). It is just incorrect to say that *Eady* has "stood the test of time"; if anything, *Eady* 's failure to attract support from other courts indicates that it has flunked that test and is ripe to be overruled. Preserving *Eady* places us on the wrong side of an intercircuit conflict, a conflict the Supreme Court would certainly resolve against us given *Eady* 's inconsistency with the federal rules and the Court's insistence that we apply those rules as written. This court should overrule *Eady* and affirm the district court's decision not to order a new trial on damages based on Varhol's failure to file a timely new trial motion to properly preserve the damages issue.

**4.** It is true that the Third Circuit has adopted a rule similar to the rule created in *Eady* in the context of motions for sentence reduction under the pre–1987 amendment version of Fed.R. Crim.P. 35. See *Virgin Islands v. Gereau,* 603 F.2d 438, 442 (3d Cir.1979). But *Gereau,* like *Eady,* offered no rationale for its holding other than citation to the Supreme Court's unique circumstances cases, which were no more applicable to the situation in *Gereau* than they were to the situation in *Eady.* More importantly, the Third Circuit has recently questioned the viability of the unique circumstances doctrine, and in that discussion also questioned *Gereau* 's viabili-

ty. See *Kraus v. Consolidated Rail Corp.,* 899 F.2d 1360, 1364–65 (3d Cir.1990). In *Kraus,* the Third Circuit "assum[ed] *arguendo* " that it could apply the unique circumstances doctrine, but stated that it would "narrowly construe[ ] and sparingly appl[y] the 'unique circumstances' exception to time requirements.' " *Id.* at 1365 (citation omitted). Given *Kraus,* one may seriously question whether the Third Circuit would continue following its holding in *Gereau,* a holding that Judge Flaum's concurrence implicitly acknowledges, concurring opinion at 1571, is not compelled by the Supreme Court's unique circumstances cases.